**FILED**
**March 27, 2014**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30824-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TORRY ANTON MARQUART, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Once again we address the constitutionality of a law enforcement officer's encounter with one later convicted of a crime based upon evidence seized during the encounter.

Torry Anton Marquart appeals his conviction for unlawful possession of methamphetamine seized following his arrest on outstanding warrants. Marquart contends the trial court erred in ruling that his initial encounter with police was a social contact instead of seizure. He also appeals the trial court's implied finding that he had a present or future ability to pay legal financial obligations as unsupported by the record. We affirm Torry Marquart's conviction and decline to reach his other assignment of error.

FACTS

During the early morning hours of February 16, 2012, Kennewick Police Department Officers Jason Kiel and Jason Harrington patrolled the city streets. Each drove a marked patrol car and wore an officer's uniform.

Officer Kiel went to Kennewick's Blue Bridge Motel to check license plates in an effort to identify stolen cars and locate individuals with arrest warrants. Kiel noticed, in the motel parking lot, a car registered to Cherie White, against whom there was an outstanding warrant. The motel's office, however, did not confirm the presence of White. After returning to his patrol car, Kiel saw two men, one later identified as Torry Marquart, walking in his direction. Officer Kiel noticed that the two men moved from his sight upon seeing him, which he considered "odd." Report of Proceedings (RP) at 32. The two ducked into a motel breezeway. Kiel notified Officer Harrington of the two males.

Officer Jason Harrington drove to the Blue Bridge Motel, but did not activate his patrol car's emergency lights or siren. Harrington parked in the motel's lot, exited his patrol car, and approached within 20 to 30 feet of the two men, who walked on a sidewalk. According to Officer Harrington, he asked the two men if they would speak with him. Harrington had no reason to suspect or detain either man for a crime. The two said "sure" and hopped down from a sidewalk to sit on a flower bed ledge. RP at 11.

2

Torry Marquart's testimony differs from the testimony of Jason Harrington. According to Marquart, Officer Harrington ordered both men to stop and directed them to speak with him. Harrington then ordered both to sit on the ledge and commanded Marquart to extinguish his cigarette. Marquart did not consider himself free to leave. Both officers concede they never informed Marquart or his companion that they were free to leave.

Officer Harrington told Torry Marquart and his companion that he sought Cherie White and asked them if they knew her. Both responded negatively. Harrington asked the men for their respective names and birth dates and both accurately responded. Marquart told Harrington that he stayed at the motel's room 158 with Russell Foster. Harrington knew of an arrest warrant for Foster. Harrington testified that, at the time Marquart identified Foster as his roommate, the officer still engaged in "social contact" with the two. RP at 13. Harrington had not shown any weapon and the two were free to leave. While Harrington spoke with the men, Officer Jason Kiel watched. Kiel described his role as a "cover officer," although he also characterized the contact as "social contact." RP at 39, 40. Kiel did not place a hand on or hold a weapon.

Officer Jason Harrington went to his patrol car to confirm the outstanding warrant for Foster. While Harrington was absent, Officer Kiel asked both men if they would show identification, which they did. Kiel did not leave the presence of Marquart while he reviewed the identification. Marquart also told Kiel that he stayed in room 158 with Russell Foster.

3

Officer Harrington confirmed the warrant for Foster and also learned of a warrant for the arrest of Torry Marquart. Harrington immediately returned to the location of Marquart. With the assistance of Officer Jason Kiel, Harrington handcuffed Marquart and placed him in the back of a patrol car.

Officers Jason Harrington and Jason Kiel proceeded to Blue Bridge Motel room 158. Russell Foster answered the door, and the officers arrested him. From outside the room, Jason Harrington spotted a female, later identified as Jayne Fuentes, standing near a bed. Officer Harrington also saw a glass pipe on the bed and baggies with white residue on an end table. Fuentes invited Harrington into the room. The two officers applied for and obtained a telephonic search warrant for room 158, while remaining outside the room. Upon obtaining the warrant, the officers entered the motel room and seized plastic baggies, digital scales, and packaging materials, which later tested positive for methamphetamine. Marquart admitted to Officer Kiel that the methamphetamine belonged to him.

Torry Marquart moved to suppress the seized methamphetamine as the fruit of an unlawful seizure, arguing that the disputed encounter was an investigatory detention unsupported by articulable suspicion. According to Marquart, the officers would never have gone to room 158 and he would not have confessed to owning the meth but for the unlawful seizure by Harrrington that caused Marquart to identify himself and his current residence. The trial court denied the motion to suppress, finding that "Officer Harrington's contact with the defendant was not under circumstances which would lead a

4

reasonable person to feel that [he was] not free to leave." Clerk's Papers (CP) at 16. Instead, the "contact with the defendant was a social contact, and was not a seizure." CP at 16. When Officer Harrington asked Torry Marquart to speak with him, Harrington showed no force. The trial court found the testimony of Officer Harrington to be more persuasive than the testimony of Torry Marquart.

Having denied Marquart's motion to suppress, the trial court found Marquart guilty of unlawful possession of a controlled substance in violation of RCW 69.50.4013(1). The trial court ordered a standard range sentence of 18 months confinement with an additional 12 months of community custody. The trial court also ordered that Marquart pay legal financial obligations of $500 victim assessment (RCW 7.68.035); $100 DNA collection fee (RCW 43.43.7541); $2,000 drug fee (RCW 69.50.430(2)); $200 filing fee (RCW 36.18.020(2)(h)); $60 sheriff's service fee (RCW 10.01.160); and $700 attorney's fees (RCW 10.01.160). Pursuant to RCW 10.01.170, the trial court ordered Marquart to "pay up to $50.00 per month . . . from any income the defendant earns while in the custody of the Department of Corrections [(DOC)]." CP at 25

## LAW AND ANALYSIS

### Findings of Fact

Before addressing whether the Kennewick police officers unlawfully seized Torry Marquart, we must first determine what happened during the encounter between Marquart and the officers. Marquart's testimony significantly diverges from the

testimony of Officers Jason Harrington and Jason Kiel. If we were to accept the story related by Marquart as the truth, we would likely agree with him that he was unlawfully seized. But the trial court found Marquart to be less than credible.

Whether police "seized" a person is a mixed question of law and fact. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). The resolution by a trial court, of differing accounts of the circumstances surrounding the encounter, are factual findings entitled to great deference. *State v. Harrington*, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). It is the trial court's role to resolve issues of credibility and to weigh evidence. *State v. Crane*, 105 Wn. App. 301, 306, 19 P.3d 1100 (2001), *overruled on other grounds State v. O'Neill*, 148 Wn.2d 564, 62 P.3d 489 (2003). But the ultimate determination of whether those facts constitute a seizure is one of law and is reviewed de novo. *Harrington*, 167 Wn.2d at 662; *State v. Beito*, 147 Wn. App. 504, 508-09, 195 P.3d 1023 (2008). Our review of whether a seizure occurred is de novo. *State v. Thorn*, 129 Wn.2d 347, 351, 917 P.2d 108 (1996), *overruled on other grounds O'Neill*, 148 Wn.2d 564.

We take these principles of review to mean we accept the trial court's findings of the bare facts uninfected by any inferences and unencumbered by legal significance. We accept the trial court's findings as to the actions taken by the officers or not taken by the officers. The trial court found that, contrary to Marquart's testimony, Officer Harrington did not order Marquart and his companion to stop. Harrington gave no orders. The trial court found Harrington exhibited no force when requesting Marquart to identify himself. We accept these findings.

6

Torry Marquart does not challenge any of the trial court's findings of fact. The rule in Washington is that unchallenged findings entered after a suppression motion hearing are verities on appeal. *O'Neill*, 148 Wn.2d at 571; *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

As noted below, a critical question is whether a reasonable person would have considered himself or herself free to move and ignore the officer's requests. Since this question involves inferences from the evidence and is infected with constitutional significance, we do not defer to the trial court's conclusion of what a reasonable person would do. We decide anew whether the officers limited themselves, before they knew of the outstanding warrant for Torry Marquart, to social contact rather than executed a "seizure."

Washington Constitution

Torry Marquart argues that the officers unlawfully seized him under the Fourth Amendment to the United States Constitution. He also contends that he was seized in violation of article I, section 7 of the state constitution. The protections guaranteed by article I, section 7 of the state constitution are qualitatively different from those under the Fourth Amendment to the United States Constitution. *State v. Snapp*, 174 Wn.2d 177, 187-88, 275 P.3d 289 (2012); *State v. Garcia-Salgado*, 170 Wn.2d 176, 183, 240 P.3d 153 (2010). It is well settled that article I, section 7 of the state constitution provides greater protection to individual privacy rights than the Fourth Amendment to the United

7

States Constitution. *State v. Rankin*, 151 Wn.2d 689, 694, 92 P.3d 202 (2004); *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002).

The Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. The text focuses on disturbance of private affairs, which casts a wider net than the Fourth Amendment's protection against "unreasonable searches and seizures." Article I, section 7 is not grounded in notions of reasonableness. *See State v. Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009). Rather, it prohibits any disturbance of an individual's private affairs without authority of law. *Id.* at 773. Because searches and seizures incontrovertibly disturb private affairs, article I, section 7 envelops searches and seizures. *Harrington*, 167 Wn.2d at 663. But because the Washington constitutional provision does not refer to seizures, the Washington Constitution should cover more. A court's analysis should focus on whether the defendant's private affairs were disturbed, not whether he was seized.

Alas, however, Washington cases involving gathering of evidence after an encounter between a suspect and an officer and that address article I, section 7 inevitably ask whether the defendant was "seized," not whether his "private affairs were disturbed." Torry Marquart provides no authority that the Washington Constitution provides him protection beyond an unreasonable seizure. Instead, he claims he was "unlawfully seized" and he relies on the test for seizures applied under the United States Fourth Amendment, the same test applied by Washington courts under our state constitution.

8

Marquart cites two federal decisions, *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) and *Fla. v. Bostick*, 501 U.S. 429, 439, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). So we provide no independent analysis under the Washington Constitution. *See Armenta*, 134 Wn.2d at 10 n.7.

Seizure

When reviewing claims of unlawful seizures, we often must isolate discrete actions of a police officer during an extended encounter, as if the actions are separate frames in a movie, since the defendant challenges more than one step employed by an officer during the encounter. Torry Marquart argues that Officer Jason Harrington "seized" him at some point before Harrington returned to his patrol car to confirm an outstanding warrant for Russell Foster, at which time Harrington also learned of an arrest warrant for Marquart. Marquart does not pinpoint the precise action of Harrington that created the seizure, but implies that the seizure occurred as early as when Harrington asked Marquart and his companion to speak. Marquart also implies that, as the conversation with Harrington progressed, the seizure increased in quantum, especially when he was repeatedly asked for identification after he told the officers he did not know Cherie White. Along these lines, Marquart argues that we should consider the totality of the circumstances, not an isolated point in time, when determining whether a seizure occurred.

If Officers Harrington and Kiel did not seize Torry Marquart, the officers needed no justification to interact with Marquart. *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct.

9

1868, 20 L. Ed. 2d 889 (1968). If the officers seized Marquart, we would need to determine if they had sufficient grounds for the seizure. *Terry*, 392 U.S. at 19. If Harrington and Kiel unconstitutionally seized Marquart before his arrest, the exclusionary rule calls for suppression of evidence obtained via the government's illegality. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); *Harrington*, 167 Wn.2d at 664; *State v. Garvin*, 166 Wn.2d 242, 254, 207 P.3d 1266 (2009).

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." But "'not all personal intercourse between policemen and citizens involves "seizures" of persons.'" *Mendenhall*, 446 U.S. at 552 (quoting *Terry v. Ohio*, 392 U.S. at 19 n.16). The defendant carries the burden to establish that he was seized. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998); *Thorn*, 129 Wn.2d at 354.

The United States Supreme Court established the test for what constitutes a seizure in *United States v. Mendenhall*, 446 U.S. 544 at 552, which test courts, including Washington courts, employ today. A seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 545; *Harrington*, 167 Wn.2d at 663; *Rankin*, 151 Wn.2d at 695. Stated differently, a police contact constitutes a seizure only if, under the totality of the circumstances, a reasonable person would not have felt free to leave, "terminate the encounter, refuse to answer the officer's question, or otherwise go

10

about his business." *Thorn*, 129 Wn.2d at 353. The subjective intent of the police is irrelevant, except insofar as it is conveyed to the defendant. *Mendenhall*, 446 U.S. at 554. Instead, we consider the officer's actual conduct and whether it reasonably appeared to be coercive. *Thorn*, 129 Wn.2d at 353. Whether a reasonable person would believe he was detained depends on the particular, objective facts surrounding the encounter. *State v. Ellwood*, 52 Wn. App. 70, 73, 757 P.2d 547 (1988). Whether there was any show of authority on the officer's part, and the extent of any such showing, are crucial factual questions in assessing whether a seizure occurred. *O'Neill*, 148 Wn.2d at 577.

Since the courts use a reasonable person standard, the test of whether a person considers himself or herself detained is the same no matter the citizen's race, sex, mental acuity, and social background. The United States Supreme Court considers the use of one standard to allow consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police. *Mich. v. Chestnut*, 486 U.S. 567, 574, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988). This consistency allows the police to determine, in advance, whether the contemplated conduct would violate the Fourth Amendment. *Chestnut*, 486 U.S. at 574.

In negligence cases, the behavior of a "reasonable person" is peculiarly an issue of fact usually reserved for a jury to decide. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). American law considers the jurors, who bring good sense and practical knowledge to the court and who act as representatives of the community, as

11

being in the best position to decide what constitutes the behavior of the mythical being, the "reasonable person." *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 994, 1005 (D. Mass. 1989) (citing Patrick E. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 TEX. L. REV. 47, 59 (1979)). The jury "'tends to make the law intelligible by keeping it in touch with the common facts of life.'" *Id.* (quoting Edson L. Haines, *The Disappearance of Civil Juries in England, Canada and Australia*, 4 DEF. L.J. 118, 126 (1958)). Most judges are not the subject of street stops and searches and rarely engage in adversarial contact with law enforcement. Judges may lack knowledge of street realities, yet courts consider themselves capable of determining what constitutes a "reasonable person" for purposes of who would consider himself or herself detained by a law enforcement officer. No court, to our knowledge, has accepted expert testimony as to whether a reasonable person would consider himself or herself detained in particular circumstances.

One might expect courts, in each discrete case, to limit their analysis to a *factual determination* of whether a reasonable person would consider his movement restrained as a result of the particular encounter with an officer. Nevertheless, courts often apply case law rules to adjudge that, as a matter of law, no reasonable person, under the case's peculiar circumstances, would consider his movement restrained. In other words, courts do not decide anew in each case whether a reasonable person would have considered herself detained.

Washington courts, with help from other courts, distinguish between social contact involving the officer and citizen and a seizure. The State characterizes the Kennewick police officers' encounter with Torry Marquart, until Officer Harrington learned of an arrest warrant for Marquart, as merely social contact. Washington courts have not defined "social contact." *Harrington*, 167 Wn.2d at 664. Such social contact "occupies an amorphous area in our jurisprudence, resting someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention" *Id.* Washington's Constitution, article I, section 7 does not forbid social contact between police and citizens. *Harrington*, 167 Wn.2d at 665.

Rules about social contact abound. "[N]ot every public street encounter between a citizen and the police rises to the stature of a seizure. Law enforcement officers do not 'seize' a person by merely approaching that individual on the street or in another public place, or by engaging him in conversation." *State v. Belanger*, 36 Wn. App. 818, 820, 677 P.2d 781 (1984). On the one hand, police activities such as engaging a citizen in conversation, identifying themselves as officers, or simply requesting identification do not convert a casual encounter into a seizure. *Fla. v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State v. Knox*, 86 Wn. App. 831, 838, 939 P.2d 710 (1997), *overruled on other grounds O'Neill*, 148 Wn.2d 564. Under Washington law, officers may request identification, including date of birth, and check for outstanding warrants during a social contact. *Armenta*, 134 Wn.2d at 11; *State v. Hansen*, 99 Wn. App. 575, 577, 994 P.2d 855 (2000); *Ellwood*, 52 Wn. App. at 73; *Belanger*, 36 Wn.

13

App. at 820. During such contact, the officer need not warn a citizen that he has the right to remain silent or walk away. *State v. Mote*, 129 Wn. App. 276, 281, 120 P.3d 596 (2005). Nor does a seizure automatically occur because an officer is in uniform or carrying a firearm. *Belanger*, 36 Wn. App. at 820.

On the other hand, a seizure occurs if the officer orders the person to sit or wait while the he checks the person's warrant status. *Ellwood*, 52 Wn. App. at 73. When an officer commands a person to halt or demands information from the person, a seizure occurs. *O'Neill*, 148 Wn.2d at 581; *Beito*, 147 Wn. App. at 509.

To discern whether an encounter is mere social contact or an investigative detention, the Supreme Court of Washington has repeatedly embraced examples given in *Mendenhall*, 446 U.S. at 554-55:

> [T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*See Harrington*, 167 Wn.2d at 664; *see also Young*, 135 Wn.2d at 512. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555.

The examples in *Mendenhall* are instructive. Here, prior to learning of Marquart's outstanding warrant, there were only two officers present. One officer stood in the background before Harrington left to confirm warrants. Neither officer displayed a

14

weapon. Neither officer touched Marquart. Neither officer commanded Marquart to sit. Neither officer compelled Marquart through tone of voice or word choice to comply with their requests. No officer directed Marquart to hold his hands where they could be seen. The gist of a seizure is a show of force that would lead a reasonable person to determine he may not leave the presence of the officer. The two Kennewick officers carefully refrained from showing any force by movement or oral direction.

As Officer Harrington spoke with Torry Marquart and Marquart's companion, Officer Kiel stood nearby as "cover." Thus, two officers were present—a factor to be considered in the *Mendehall* analysis. Two Washington decisions have discussed the presence of two officers. In *State v. Harrington*, 144 Wn. App. 558, 183 P.3d 352 (2008), the Court of Appeals held that the presence of two officers did not turn the social contact into a seizure. The Supreme Court reversed noting the arrival of a second officer contributed to but did not start the seizure. *Harrington*, 167 Wn.2d at 666. The Supreme Court emphasized the ordering of Harrington to remove his hands from his pockets as starting the seizure. *Id.* at 666-67. In *State v. Hansen*, 99 Wn. App. 575, the court impliedly ruled that the presence of two officers does not create a seizure.

We agree with Torry Marquart that, even where an initial contact does not amount to a seizure, it may "mature" or "transform" into a seizure if the officer's actions ultimately create a situation where the individual no longer feels free to leave. *Royer*, 460 U.S. at 503; *State v. Richardson*, 64 Wn. App. 693, 697, 825 P.2d 754 (1992). A series of police actions may meet constitutional muster when each action is viewed

15

individually, but may nevertheless constitute an unlawful search or seizure when the actions are viewed cumulatively. *Harrington*, 167 Wn.2d at 668. We find there was no transformation here. Before Harrington left for his patrol car, the officers had shown no force or barked any command. Therefore, Marquart has not met his burden of proving a seizure before the discovery of the arrest warrant.

Marquart cites *State v. Crane*, 105 Wn. App. 301, as being analogous. In *Crane*, the officer parked his patrol car into a driveway behind the car in which Crane was a passenger. As Crane exited the vehicle, the officer asked for identification and checked for warrants. Crane had entered a secured area. Because the car in which he was riding was blocked, Crane was more a passenger than a pedestrian for purposes of determining whether he was seized. As our Supreme Court stated in *Rankin*:

> We think there are good reasons for making a distinction between
> pedestrians and passengers. As we have said, "many [individuals] find a
> greater sense of security and privacy in traveling in an automobile than they
> do in exposing themselves by pedestrian or other modes of travel." *City of
> Seattle v. Mesiani*, 110 Wn.2d 454, 457, 755 P.2d 775 (1988). Indeed, a
> passenger faced with undesirable questioning by the police does not have
> the realistic alternative of leaving the scene as does a pedestrian.

151 Wn.2d at 697 (alteration in original) (internal quotation marks omitted) (quoting *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S. Ct. 1391, 59 L. Ed.2d 660 (1979)). Here, Marquart was a pedestrian. The officers retained his identification for only a brief time. No additional circumstances merit deeming the encounter a seizure.

*State v. Bailey* contains facts more similar to this case than *Crane*. *State v. Bailey*, 154 Wn. App. 295, 224 P.3d 852 (2010). In *Bailey*, the officer approached the defendant,

16

and asked if he had a moment. When the officer repeated the question, the defendant said that he did, and walked towards the officer. The defendant handed the officer his identification, and stated that he might have a warrant. No seizure occurred.

Torry Marquart emphasizes that Officer Kiel took his identification card. But the trial court found that Kiel did not leave the presence of Marquart with the card. A seizure occurs when the officer retains the suspect's identification while conducting a warrants check away from the suspect. *Crane*, 105 Wn. App. at 310; *State v. Thomas*, 91 Wn. App. 195, 200-01, 955 P.2d 420 (1998). Anyway, Kiel's action occurred after Harrington left for his patrol car, during which time Harrington discovered the warrant for Marquart.

We acknowledge that empirical evidence supports a conclusion that citizens do not "feel free to leave when [they are] questioned by a police officer on the street." David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. CRIM. L. & CRIMINOLOGY 51, 73 (2009); Illya Lichtenberg, *Miranda in Ohio: The Effects of Robinettte on the "Voluntary" Waiver of Fourth Amendment Rights*, 44 HOW. L.J. 349 (2001). Psychological literature teaches that people feel compelled to comply with authority figures, particularly law enforcement. Torry Marquart's behavior and the behavior of a host of other defendants in an unending procession of court decisions corroborates that citizens readily relinquish information and consent to searches by law enforcement officers despite the cooperation directly leading to the discovery of inculpating evidence. The behavior of these defendants is counterintuitive to a finding

17

that they did not deem themselves restrained, intimidated, or coerced by the presence of law enforcement. The behavior of these defendants was irrational. Unless jail was desired, Marquart acted as an unreasonable person when telling Officer Harrington his name and hotel room number.

Two prominent State court of appeals judges, including a veteran of our division, penned dissents questioning Washington courts' labeling of street encounters as social contact and challenging our reluctance to declare street encounters "seizures." *See State v. Nettles*, 70 Wn. App. 706, 714, 855 P.2d 699 (1993) (Baker, J., dissenting); *see also Harrington*, 144 Wn. App. at 564 (Sweeney, J., dissenting). Judge Sweeney wrote:

> We do a disservice to the public and to police by moving the so-called 'social contact' into just another form of seizure, albeit without any cause or suspicion of crime or danger to the public or the police.
> A social contact should be just that—a social contact—not an opportunity for police to investigate, provoke, or 'find' criminal activity. This may have started as a casual encounter, but it escalated into something more, without probable cause or even a reasonable suspicion that Mr. Harrington had done anything wrong.

*Harrington*, 144 Wn. App. at 564.

But Washington law demands that an officer, without an overt show of force, be free to ask questions and provoke incriminating evidence without the encounter being labeled a seizure. This rule is universal in state and federal courts. Our state Supreme Court has found that effective law enforcement techniques not only require passive police observation, but also necessitate interaction with citizens on the streets. *Harrington*, 167 Wn.2d at 665. The court wrote in *O'Neill*:

18

> Citizens of this state expect police officers to do more than react to crimes that have already occurred. They also expect the police to investigate when circumstances are suspicious, to interact with citizens to keep informed about what is happening in a neighborhood, and to be available for citizens' questions, comments, and information citizens may offer.

148 Wn.2d at 576. Division two of this court wrote in *State v. Stroud*:

> [C]haracterizing every street encounter between a citizen and police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished.

30 Wn. App. 392, 395, 634 P.2d 316 (1981) (quoting *Mendenhall*, 446 U.S. at 554)

Until a change in seizure law by our state high court or state legislature, good and effective neighborhood policing will continue to produce evidence of criminality despite the charade that the gathering of the evidence is through voluntary social contact. Thus, we affirm a ruling that Torry Marquart was not seized until Officer Harrington, with knowledge of the outstanding warrant, arrested Marquart.

Legal Financial Obligations

Whenever a person is convicted in superior court, the court may order the payment of a legal financial obligation (LFO) as part of the sentence. RCW 9.94A.760(1). "Legal financial obligation[s]," defined by RCW 9.94A.030(30), include "restitution to the victim, statutorily imposed crime victims' compensation fees . . . court costs, county or

19

interlocal drug funds, court-appointed attorneys' fees, and costs of defense, fines, and any other financial obligation that is assessed to the offender as a result of a felony conviction."

The trial court ordered Marquart to pay $500 victim assessment (RCW 7.68.035), $100 DNA collection fee (RCW 43.43.7541), $200 filing fee (RCW 36.18.020(2)(h)), and $2,000 drug fee (RCW 69.50.430(2)). These fines do not require the trial court to consider Marquart's ability to pay and are imposed by statute.

At its discretion, the trial court may order a convicted defendant to pay court costs. RCW 10.01.160. RCW 10.01.160(3) requires that, "[i]n determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." The trial court ordered Marquart to pay costs of a $60 sheriff's service fee and $700 attorney's fees, but made no specific finding of his ability to pay the costs. Nonetheless, we conclude it is premature for this court to address the error for two reasons.

First, challenges to LFOs are not properly before this court until the State seeks to enforce them. *State v. Hathaway*, 161 Wn. App. 634, 651, 251 P.3d 253 (2011); *State v. Smits*, 152 Wn. App. 514, 524, 216 P.3d 1097 (2009). Because a person is not an "aggrieved party" under RAP 3.1 "until the State seeks to enforce the award of costs and it is determined that [the defendant] has the ability to pay," appellate review is inappropriate. *State v. Mahone*, 98 Wn. App. 342, 349, 989 P.2d 583 (1999); *see also State v. Blank*, 131 Wn.2d 230, 242, 930 P.2d 1213 (1997). In *State v. Crook*, 146 Wn.

20

App. 24, 27-28, 189 P.3d 811 (2008), this division held that "[m]andatory Department of Corrections deductions from inmate wages for repayment of legal financial obligations are not collection actions by the State requiring inquiry into a defendant's financial status." Thus, "[i]nquiry into the defendant's ability to pay is appropriate only when the State enforces collection under the judgment or imposes sanctions for nonpayment." *Crook*, 146 Wn. App. at 27.

The trial court ordered Marquart to "pay up to $50.00 per month to be taken from any income the defendant earns while in the custody of the Department of Corrections." CP at 25. Since RCW 72.09.111(1) directs the DOC to "deduct taxes and *legal financial obligations* from the gross wages, gratuities, or workers' compensation benefits," such deductions do not constitute a collection action by the State. (Emphasis added.) The trial court's order, in this case, of "up to" $50 per month is flexible enough to comport with these guidelines and formulas. Thus, further inquiry into Marquart's ability to pay would be inappropriate until the State seeks to collect his LFOs.

Second, when and if the State seeks to collect, Marquart may petition the court for remission under RCW 10.01.160(4), which states:

> A defendant who has been ordered to pay costs and who is not in contumacious default in the payment thereof may at any time petition the sentencing court for remission of the payment of costs or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the court may remit all or part of the amount due in costs, or modify the method of payment under RCW 10.01.170.

The denial or granting of *that motion* would warrant appellate review.

21

No. 30824-3-III
*State v. Marquart*

### CONCLUSION

We affirm the trial court's denial of the motion to suppress and the conviction.

We decline to address validity of the LFOs imposed. Torry Marquart may raise their

validity at the time the State seeks to enforce the obligations.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.

I CONCUR IN RESULT:

_____
Siddoway, J.

22

No. 30824-3-III

KORSMO, C.J. (Concurrence) — The lead opinion unnecessarily opines about perceived shortcomings in article I, section 7 analysis and the application of the reasonable person standard to street encounters. We are an appellate court whose job is to review trial court proceedings for error and, where prejudicial error exists, do what we can to correct that error. We are not a policy body or a debating society, particularly where (as in this case) the parties have neither asked us to explicate nor change existing policy or forms of analysis. Such exchanges have marginal utility in courts of last resort, but have next to zero utility in intermediate appellate courts. Accordingly, I concur only in the outcome of the lead opinion.

While that is probably all that needs to be said, I briefly will risk further comment although I do so with the full knowledge that this exercise is ultimately meaningless. There is no need to lament the fact that police seizures are analyzed as seizures rather than under a more generic concept of privacy because there is no evidence that article I, section 7 was intended to do more than reflect the prevailing Fourth Amendment norms of the day. *See Boyd v. United States*, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886) (finding Fourth and Fifth Amendment protections for one's "private papers" reflecting

business operations). Indeed, the seminal work suggesting a common law right of privacy was not published until the year after our constitution took effect. *See* S. Warren & L. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890). Even at that, Washington declined to accept the existence of a right of privacy for a significant period of time. *See, e.g., Lewis v. Physicians and Dentists Credit Bureau, Inc.*, 27 Wn.2d 267, 177 P.2d 896 (1947) (discussing history of privacy in Washington and declining at that time to decide whether right to privacy existed).

Given the rather tepid history of privacy in this state, it is understandable that our constitutional protections are litigated at the level of an actual government intrusion rather than at some more abstract level. After all, our constitutions protect us from our governments, not from all other inhabitants. If there is a free-standing right of privacy under the constitution, it is only the invasion of that right by the government that gives rise to a violation. Hence, the first thing that typically is analyzed is whether an intrusion occurred. There is no need to attempt to discern what the term "private affairs" encompasses if the government has not intruded.

Since both article I, section 7 and the Fourth Amendment clearly do apply to seizures by the police, the facts of this case are properly analyzed under those provisions in accordance with the well-developed case law. When it does that, the lead opinion properly reaches the same conclusion as the trial court. That is where the analysis should

2

No. 30824-3-III
*State v. Marquart* (Concurrence)

have begun and ended. Given that there was no intrusion here before the arrest warrant

was discovered, there was no error.

I respectfully concur in the result.

_____
Korsmo, C.J.

3